Fritz W. Alexander, II, J.
On December 2, 1966, Kenneth Mark Lewis, then a practicing general surgeon, was involved in a two-car collision with a vehicle driven by Harry Preis, at the intersection of 96th Street and Madison Avenue in Manhattan. *1068 The Preis vehicle, a small pickup truck, was owned by Beacon Rental Corporation and leased to Preis ’ employer, Standard Electro-Therm Corp. The car driven by Dr. Lewis was owned by Cars Unlimited Corp. Property damage actions arising out of this accident were consolidated with the principal action for personal injuries and wrongful death and, by stipulation of the parties, are disposed of herein by the court.
On July 10, 1967, Dr. Lewis died” from a self-inflicted gunshot wound sustained on July 9,1967. William R. Fuller, executor of Dr.. Lewis ’. estate, contends that the accident resulted solely from Preis’ negligence and is so connected and causally related to Lewis’ death as to render the" defendants Preis, Beacon, and Standard Electro-Therm fully liable for both the pain and suffering experienced by the decedent between the date of the accident and the date of his death and for the pecuniary loss sustained by his dependence as provided for in EPTL 5-4.1.
An action for personal injuries was commenced against these defendants by Dr. Lewis during his lifetime. After his death, on motion of the executor, leave was granted to amend the complaint to add a cause of action for wrongful death. The defendants vigorously opposed that motion. The decision at Special Term, which found that “ sufficient (had been shown on the motion) to create an issue of fact as to causality, and, .at the least entitles plaintiff to have the issue tried ’ ’, was affirmed in a four to one decision by the Appellate Division. (Fuller v. Preis, 34 A D 2d 514.)
In principal reliance upon Corrieri v. Cole (26 N Y 2d 932, affg. 33 A D 2d 655), defendants moved to dismiss the amended complaint at the conclusion of plaintiff’s opening to the jury. While recognizing similarities between the Corrieri case and the case at bar, I denied that motion, persuaded in part by the fact that the Appellate Division, although not squarely presented with the question (the issue there was whether Special Term had properly exercised its discretion in .allowing an amendment of the complaint) took no exception to Special Term’s assertion that plaintiff was entitled to have the issue of causality tried and expressly declined to ‘ ‘ pass on the merits of the cause of action for wrongful death. ” (Fuller v. Preis, supra).
Moreover, as will later appear, significant differences exist between the case at bar and the Corrieri case that justify the refusal to deny plaintiff a full and fair opportunity to demonstrate through competent proof a cognizable right to recovery.
*1069 The jury returned a verdict for plaintiff on both causes of action: $200,000 on the wrongful death claim and $50,000 for pain and suffering. Defendants moved to set aside the verdict, (1) as excessive, (2) as contrary to law, (3) as against the weight of the credible evidence, etc. For the reasons set forth below, these motions are denied.
Central to the theory of plaintiff’s case is the assertion that decedent sustained organic brain damage to the left side of his head at the time of the accident. This damage, described as a “ cerebral contusion of the left frontal parietal area,” involved destruction of cells in the cortex of that portion of the brain that controls and regulates motor activity and the tonal quality of emotionality.
This injury is claimed to have produced progressively worse organic deterioration of the brain with repeated convulsive seizures that resulted in a state of insanity during which Dr. Lewis was possessed of an “ irresistible impulse ” to take his own life. Plaintiff contends therefore that the accident was the proximate cause of Dr. Lewis ’ death.
In support of this contention, plaintiff adduced testimony to the effect that, on December 2, 1966, decedent, on his way to make a house call for a patient who resided on East 77th Street, was stopped for a red light in the eastbound traffic lanes on 96th Street at its intersection with Madison Avenue. The light changed to green, Dr. Lewis proceeded across the intersection and was struck in the right side of his vehicle by the truck driven by Harry Preis. He struck the left side of his head against the frame and the window on the driver’s side of the car. It is claimed that the window on the right side of the decedent’s car was smashed and it was conceded that the cost of repairs to the car was $837.07. The cost of repair of defendant’s vehicle was $753.71.
After the accident, Lewis was described as appearing agitated, holding his head and looking ‘ ‘ like a person who had been in an accident.” He was said to have been confused; that he found himself ‘ ‘ down on First Avenue, ’ ’ after driving from the scene of the accident, rather than on East 77th Street, his intended destination.
He returned to his home and was qbserved by his wife holding the left side of his head where a lump was forming. He retired early and at 2:30-3:00 a.m. the following morning experienced an episode of projectile vomiting. An examination at Roosevelt Hospital later that day did not reveal any significant findings and Dr. Lewis was instructed to return home. On Decern *1070 her 4, two days after the accident, his wife observed him having a seizure. She testified that she observed the right side of his body, the arm and the leg, twitching uncontrollably and stated that he was frothing at the mouth. She described the next seizure that occurred a couple of days later in the middle of the night, as more violent. She was awakened by the shaking of the bed and testified that the decedent was unconscious for a period of time.
Following the second seizure, Dr. Lewis was hospitalized at Roosevelt Hospital where he remained for four or five days. The hospital record reports a seizure of some 20 minutes’ duration, with loss of consciousness, on the night of his admission. Again, no significant findings were revealed by examinations conducted during this hospital stay and he was later released with medications prescribed to control the seizures.
Plaintiff’s proof indicated that the seizures continued, recurring once or twice a week until January 16,1967, when Dr. Lewis was admitted to the Neurological Institute at Presbyterian Hospital. He was reported to have had a seizure of some 10 minutes’ duration on the day following his admission. Again, the neurological tests performed during this hospitalization were within normal limits, except that an electroencephalogram continued to show some scattered slow-wave activity, described as a “ short-circuiting ” and as indicative of subdural hemorrhaging with resultant scar tissue formation.
Dilantin and phenobarbital medications were continued but apparently were not effective in controlling the convulsive seizures Dr. Lewis continued to experience. These seizures, some 41 in all (including those that preceded the confinement at Neurological Institute), continued following his release from the hospital on January 20, with varying frequency and intensity to July 5, 1967.
Testimony was adduced that tended to show that from the date of the accident and increasingly during the months of February, March, April, May, and June, 1967, Dr. Lewis experienced progressively increased unstableness, emotional and motor instability, diminished alertness and overt depression. He was said to have displayed none of these symptoms prior to the accident and to have had no prior medical history that was considered as contributing thereto. He gave up his practice of surgery and attempted, unsuccessfully, to do consultative work at Strang Clinic. His memory span became progressively shorter; his right eyelid drooped and he was unable to drive an automobile.
*1071 On July 9, he was reported to have had two seizures during the morning, the second more violent than the first. Mrs. Lewis testified that he had a third, even more violent, seizure later during the afternoon; that he did not respond to her as he had previously; that he had a ‘ ‘ different ’ ’ look on his face. He went into the bathroom and locked himself in. She called to him but he did not recognize her by name. She heard him say, 1 ‘ I must do it, I must do it, ’ ’ and then heard a noise that sounded like a gunshot, followed by the smell of gunsmoke. The police were called. They subsequently arrived and removed Dr. Lewis to Metropolitan Hospital where he expired on July 10.
Dr. James F. Hammill, a neurosurgeon who had attended the decedent during and subsequent to his confinement at Neurological Institute, called as a witness for plaintiff, testified that the decedent “had a whole series of increasingly frequent and severe convulsive phenomena. He had objective neurological findings. The situation within the bathroom at that time indicated disorientation, lack of awareness, and that he had * ° * after this cluster of seizures was obviously not in a rational state; in an insane state, and that all that subsequently grew out of that was a function of that state of organically induced postconvulsive insanity.”
It was Dr. Hammill’s opinion that decedent sustained a cerebral contusion in the accident of December 2, accompanied by organic brain damage that became progressively worse with the ensuing convulsive seizures. He testified that the contusion caused subdural hemorrhaging with resulting scarring of the cellular tissue that is nonrestorative. Each seizure raised the danger of additional cell-fallout with an increase in the scar tissue. He testified that as a result of the seizures sustained in the accident Dr. Lewis suffered from “ convulsive psychosis ” and ‘ ‘ confusional Dementia ’ ’ all of which produced a 1 ‘ post-traumatic convulsive insanity ’ ’ that, in his opinion, prevented the decedent from knowing “ the nature and quality of his act at the time he took his life. ’ ’
Defendants’ attack upon this proof, both through cross-examination of plaintiff’s witnesses and through direct proof, established that Mrs. Lewis, a polio victim, suffered a worsening of her condition in May, 1967, and that decedent’s mother had become hospitalized with a diagnosis of cancer in the spring of 1967. Defendants argued that both of these events caused the decedent to become extremely depressed, and brought out that prior to the accident Dr. Lewis was experiencing difficulty sleeping at night. Defendants established that the decedent executed *1072 his last will and testament on July 7, 1967; that he wrote two suicide notes, dated July 9, 1967, in which he asserted that he was fully aware of what he was doing* and requested that the longer, more detailed note he concealed from all but the immediate family because to reveal its content would “ ruin'the case ”; that decedent had a prior medical history of bronchial asthma and also was afflicted with Bullish Emphysema; that prior to the accident, because of his insomnia and depression, he was taking .2 of a gram of Seconal nightly, which was described as a hypnotic dose.
Defendants proof disputed the severity of the impact between the two vehicles and the appearance and conduct of Dr. Lewis immediately following* the accident. Harry Preis, called as a witness for defendants, described the impact as ‘ ‘ light to moderate ” and stated that Dr. Lewis told him that he was not injured. The police officer who responded at the accident scene also testified that Dr. Lewis “ looked normal ” and spent some 15 to 20 minutes exchanging information.
Dr. Israel Freiman, the medical expert called as a witness for defendants, expressed the opinion that the collision, as described to him, was too mild to cause a cerebral contusion and would not produce a traumatic convulsive seizure. Dr. Freiman was of the opinion that the decedent suffered from a ‘ ‘ classical depression ” that was no different from any other “ classical depression ’ ’; that the suicide was wholly unrelated to the accident and that the two events were not causally connected. He testified that the suicide notes clearly indicate that Dr. Lewis followed a clearly thought-out plan, knew what he was doing and knew the consequences of his act. He further pointed to the execution of the last will and testament as an indication that Dr. Lewis knew what he was doing and was not insane. Dr. Freiman asserted the opinion that the decedent was not acting under an “ impulse ” when he took his life but rather suffered from a severe ongoing depression produced by a series of events described as one catastrophe after another.
Although defendants’ post-trial motions attack the verdict in its entirety, no serious argument can be made that the jury’s verdict finding for the plaintiff on the second cause of action for pain and suffering is not amply supported by the evidence nor in light of the proof adduced can that verdict be said to be excessive.
The question then is whether the verdict in favor of the plaintiff in the wrongful death action is contrary to law and thus must be set aside. Put differently, will the law permit a recov *1073 ery for ‘ ‘ wrongful death ’ ’ arising out of negligent conduct where there is an “ intervening ’ ’ suicide, alleged to have occurred during .a state of ‘ ‘ insanity, ’ ’ caused by that negligent conduct?
The Corrieri case referred to previously, seems to be the only reported decision decided in this jurisdiction in recent years involving an alleged negligently caused ‘ ‘ wrongful death by suicide. ’ ’
The trial court there (Gittleson, J.) dismissed the complaint on motion made at the close of plaintiff’s opening to the jury, holding on the authority of Scheffer v. Railroad Co. (105 U. S. 249) and Salsedo v. Palmer (278 F. 92), that the negligence of the defendant was “ too remote as a cause of death to justify recovery * * * that the tragic results were not the natural,
probable consequences, that they could not have been foreseen in the light of the circumstances attending the negligence of the driver of the defendant’s truck ”.
Both the Appellate Division and the Court of Appeals affirmed this decision, but without opinion. (See Corrieri v. Cole, 33 A D 2d 655, affd. 26 N Y 2d 932, supra.)
Defendants argue that Corrieri is on “ all fours ” with the case at bar and should be followed. To the extent that the record on appeal in Corrieri reveals the facts of that case, there are significant factual differences that justify a different result, unless the rule of Scheffer and Salsedo is the law of this State and is absolute.
Firstly, the impact between the vehicles in Corrieri apparently was substantially less violent than in the case at bar. There, defendant’s truck backed into a standing taxicab, doing some $183 damage to the cab, while here two moving vehicles collided, with $800 plus damage to one and $750 plus damage to the other. It was conceded that no organic brain damage was suffered in the accident by the decedent, Corrieri. He was diagnosed as “ schizophrenic reaction, paranoid type ” and was revealed to have had a preaccident diagnosis as “ a psychoneurotic — as being in a psychoneurotic anxiety state, ’ ’ receiving treatment up to a year before the accident.
There was no claim that at the time of his suicide, Corrieri was “insane” or possessed of an “irresistible impulse” caused by the accident. The nubbin of that plaintiff’s claim, and the offer of supporting medical proof, was that Carrier! was a “ psychiotic ”, that “ although he had a history of psycho-neurotic reactions, that the accident on September 14,1962, acted as a psychological trauma and precipitated a psychotic break *1074 [that] set off the pattern which influenced his behavior and terminated in his suicide * * * that the accident had a causal relationship to his demise ” (Emphasis added.)
In Scheffer v. Railroad Co. (105 U. S. 249, 252, supra) the United States Supreme Court held in 1881, that “ ‘ in order to warrant a finding that negligence or an act not amounting to wanton wrong is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.’ ” The court went on to say (p. 252) that “ The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train.
‘ ‘ His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials, as his suicide, and each of these are causal or unexpected causes, intervening between the act which injured him, and his death.” (Emphasis added.)
Salsedo v. Palmer (278 F. 92) decided by the Circuit Court of Appeals of the Second Circuit in 1921, followed the decision in Scheffer, applying the rule to an intentional tort circumstance, with a strong dissent by Judge Maybe. There too, a claim was made that the acts of the defendants caused the 11 insanity ’ ’ of the decedent and that he took his own life while in a state of “ insanity.”
It is to be noted that these cases, Corrieri, Scheffer and Salsedo, state that the wrongful act of the defendant was not the ‘1 proximate cause ’ ’ of the insanity of the decedent nor of his death by suicide; that the negligence was “ too remote as a cause of death to justify recovery ’ ’; that the suicide was not the ‘ ‘ natural and probable ’ ’ result of the wrongful act of the decedent and was not ‘ ‘ foreseeable ’ ’ in the light of the attending circumstances.
The majority opinion in Salsedo, adopting the views of such early writers as Lord Bacon and Pollock, in circumscribing the laws’ inquiry in affixing responsibility for injury, asserts (p. 94) that ‘1 in ascertaining the cause of an injury in order to fix liability therefor one cannot go behind the last cause. The final cause and its immediate effect alone concern the court ” and that (p. 95) “for the purpose of civil liability, those consequences, and those only, are deemed ‘ immediate,’ ‘ proximate,’ *1075 or 1 natural and probable which a person of average competence and knowledge, being in the like case with the person whose conduct is complained of, and having the like opportunities of observation, might be expected to foresee as likely to follow upon such conduct. ’ ’
Whatever the language used by the courts in these cases, it is clear that they viewed the suicide as an independent, intervening act, sufficient in law to break the causal chain between the acts of the defendants and the death "of the decedent.
To the extent that the suicide of the decedent is his voluntary act, committed in the exercise of a moderately intelligent power of choice, albeit the choice is determined by a disordered mind (Daniels v. New York, New Haven, & Hartford R. R. Co., 183 Mass. 393), there is a break in the causal chain sufficient to relieve the defendant of liability, even for his intentional tort. It is properly said, in that circumstance, that the suicide was not the “ natural and probable consequence of the wrongful act of the defendant,” that the intentional act of suicide and not the wrongful act of the defendant was the “proximate cause ” of death and that death by suicide was “ not a foreseeable consequence ” of the defendants’ wrong.
But what if the decedent, in committing the act of self-destruction was 11 so mentally disordered as not to understand that the act he committed would cause his death, or committed it under the influence of some insane impulse which he could not resist, although knowing the consequences ”? Is recovery for wrongful death to be denied under the Scheffer and Salsedo rule? Prosser, acknowledging that Scheffer and Salsedo reach a contrary conclusion, asserts in his 4th edition that “it is the prevailing view that when his insanity prevents him from realizing the nature of his act or controlling his conduct, the suicide is to be regarded as a direct result, and no intervening force at all, or else as a normal incident of the consequences inflicted, for which the defendant will be liable.” (Prosser, Torts [4th ed.], § 44, p. 280.)
In declining to follow Salsedo in an intentional tort situation, Mr. Justice Edgab J. Nathan, Jb., held that the rule, adopted by the Restatement of Torts and the text writers, ‘ ‘ that where the suicide is committed in a state of insanity in response to an uncontrollable impulse, recovery may be had if the mental state of the decedent, was caused by the defendant’s wrongful act * * * is a more realistic approach to the problem and. the one that should be adopted in this State.” (Cauverien v. De Metz, 20 Misc 2d 114, 148.)
*1076 Although it reversed a jury verdict for plaintiff because of insufficient proof of insanity, and declined to rule specifically on the issue because of the 1 ‘ importance of the question and the far-reaching consequences,” the Appellate Division, First Department stated in Koch v. Fox (71 App. Div. 288, 298), decided in 1902, that: “ If insanity resulted directly from the injuries negligently inflicted and as the natural and probable cause, I fail to see how the involuntary act of an insane man in either injuring or killing himself can be deemed an efficient independent cause constituting the proximate cause of the injuries thus inflicted upon himself, or of his death brought about by his insane acts. It seems to me that the negligent act, being the cause of his insanity which deprives him of his reason, is the proximate cause of the self-inflicted injuries of death. Impairment of mental capacity is an element of damage * * * and I have no doubt that a person who is rendered insane by a physical injury caused by negligence, or his committee, can maintain an action and recover damages for the dethronement of his reason. Where an action could have been maintained by the person injured the Code authorizes a recovery by his administrator * * * It would seem to follow that if the insanity is the natural and probable result of the injury, the party through whose negligence it was inflicted would be liable for the death of the insane person brought about by his own act, provided such death be the ordinary and natural result of the negligence act, and not too remote in time, or its connection with the injury be not involved in such doubt and uncertainty as to render it inadvisable upon grounds of public policy to hold the wrongdoer responsible therefor.”
Defendants argue that Koch v. Fox in fact supports their contention in that the ‘ ‘ insanity ’ ’ of Dr. Lewis, if in fact he was “ insane,” was not the t>l natural and probable ” result of the injury sustained in the accident, nor was his death the ‘ ‘ ordinary and natural result of the negligent act ” of the defendant ; that the death was remote in time and that neither the “ insanity ’ ’ nor the suicide was a 1 ‘ foreseeable ’ ’ consequence of the defendant’s negligence.
If by “ natural and probable ” and “ ordinary ” and “ natural ” result, it is meant those “ consequences which are normal, not extraordinary, not surprising in the light of ordinary experience ” (Prosser, Torts [4th ed.], § 43, p. 252), then it would appear that these words are the equivalent of “ foreseeable consequences.” The test, however, is not the “ foreseeability ” of the particular consequences flowing from the negligence of the *1077 defendant, but rather the foreseeability of any harm resulting from the careless conduct. “ If a negligent act be the reasonable and proximate cause of an injury — that is, if the plaintiff’s injury is traceable to the defendant’s negligence without the intervention of any other independent, legally operative event — the injured person is entitled to recover for the harm actually suffered, even though the precise nature and extent of those injuries, as they finally developed, were more severe than could ordinarily have been foreseen. (Poplar v. Bourjois, Inc., 298 N. Y. 62, 67.)
The jury, by its verdict, has found that Dr. Lewis was “ insane ” on July 9, 1967; that he was seized by an “ irresistible impulse ” that rendered the act of suicide “ not his voluntary act ’ ’ and thus ineffectual in breaking the causal chain. They have found, and I hold that such finding is not so contrary to the proof as to be unsupported, that this state of insanity was “ caused ” by the injuries sustained in the accident of December 2,1966.
This court is not prepared to say, as a matter of law, ‘ ‘ that the full coverage of tort liability cannot embrace the facts and circumstances here involved ” (Cauverien v. De Metz, supra, p. 149) or that public policy considerations mandate a denial of recovery to this plaintiff. “ The problem for the law is to limit the legal consequences of wrongs to a controllable degree.” (Tobin v. Grossman, 24 N Y 2d 609, 619.)
As pointed out by Judge Keating in his dissent in Tobin v. Grossman (supra, pp. 620-621), “ The only real requirement, however, which policy and justice dictate, is stringent evidence of causation and of actual injury to deter those who would use a sound and just rule as a cover for spurious claims.” This test has been adequately met in the case at bar.
To the argument advanced by defendants that recovery for wrongful death should be denied because the decedent, having committed suicide, could not himself have maintained the action if ‘ ‘ death had not ensued ’ ’ suffice it to say that ‘ ‘ ‘ the condition, that the action could have been maintained by the deceased if death had not ensued, has reference, not to the nature of the loss or injury sustained, but to the circumstances under which the bodily injury arose, and the nature of the wrongful act, neglect, or default complained of ’ ”. (Cauveriene v. De Metz, 20 Misc 2d 144, 146.)
Defendants ’ motions therefore are, in all respects denied and judgment for the plaintiff is directed to be entered upon the jury’s verdict.
*1078 Application for an order pursuant to EPTL 5-4.4 for distribution of the damages recovered may be made before me on proper notice.
The property damage actions, reserved to the court by stipulation of the parties are disposed of as follows: Judgment is directed to be entered dismissing the complaint in the action of Beacon Rental Corporation v. Kenneth M. Lewis and Cars Unlimited Corp. Judgment is directed to be entered in favor of the plaintiff Cars Unlimited Corp. in the sum of $837.07, in the action entitled “ Cars Unlimited Corp. v. Beacon Rental Corporation and Harvey Preis.”